# District of Columbia
# Court of Appeals

**No. 13-CF-614**

TERRY JOHNSON,

Appellant,

FILED

APR **14** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CF1-24796-11**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: GLICKMAN and THOMPSON, *Associate Judges*; and FARRELL, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's convictions are reversed and the case is remanded for a new trial in accordance with this decision.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: April 14, 2016.

Opinion by Associate Judge Stephen Glickman.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-614

FILED 4/14/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

TERRY JOHNSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-24796-11)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued May 5, 2015                              Decided April 14, 2016)

*Chris Kemmitt*, Public Defender Service, with whom *James Klein* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Kristina L. Ament*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Michelle N. Bradford*, and *John P. Gidez*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and FARRELL, *Senior Judge*.

GLICKMAN, *Associate Judge*: The question at appellant Terry Johnson's trial was whether he was the masked man who gunned down Andre Wiggins on the street outside his home in broad daylight. Lacking direct evidence of the shooter's

identity, the prosecution relied on evidence of the pre-existing enmity between appellant and Wiggins, which had erupted in open warfare between them the previous month, and of incriminating admissions allegedly made by appellant after the shooting. The jury was persuaded by this evidence and found appellant guilty of second-degree murder while armed and related firearm offenses.

What the jury did not know when it arrived at its verdict was that Wiggins had two other enemies—two men he recently had assaulted and robbed—who also may have had the motive and opportunity to kill him. Appellant's principal claim in this appeal is that the trial court committed reversible error under *Winfield v. United States*[1] when it precluded him from presenting any evidence of these potential third-party perpetrators to rebut the government's case against him. We agree with this contention, reverse appellant's convictions, and remand for a new trial.

Appellant also argues that the trial court erred in a few other respects: (1) in declining his request for sanctions after it found a violation of *Brady v. Maryland*[2] in the government's failure for over a year to disclose information in its possession

---

[1] 676 A.2d 1 (D.C. 1996) (en banc).

[2] 373 U.S. 83 (1963).

regarding one of the potential third-party perpetrators of Wiggins's murder; (2) in permitting the government to make the false and misleading assertion in rebuttal argument that appellant was the only person who had a motive and the means to kill Wiggins; and (3) in curtailing his bias cross-examination of a jailhouse informant. Because appellant's *Winfield* claim by itself entitles him to a new trial, his objection to the rebuttal comment is moot and his remaining issues, while not moot, require only limited discussion at this juncture.

## I.

Appellant was tried for the murder of Andre ("Dre") Wiggins, who was shot and killed shortly before noon on October 26, 2011, as he was walking across the street from his home at the corner of Division Avenue and Clay Street, Northeast, near the Clay Terrace neighborhood. Wiggins was gunned down by a man in a ski mask. A witness happening to look out her apartment window saw the masked man emerge from an alley in the 5200 block of Clay Street and approach Wiggins on foot. The man fired several shots at Wiggins and then fled back through the alley.

The government presented no witness who could identify Wiggins's masked assailant or provide more than a vague description of him.[3] There likewise was no forensic or physical evidence that could be used to identify the shooter or link appellant to the crime. Lacking such direct evidence of appellant's guilt, the prosecution relied heavily on testimony about animosity and prior violence between Wiggins and appellant leading up to the shooting, and about incriminating statements appellant allegedly made in its aftermath.

Although the men's enmity arose after Wiggins began dating appellant's ex-girlfriend earlier in 2011, their hostility burst into violence in the two months preceding Wiggins's death. On the evening of September 16, 2011, Wiggins was hanging out on Clay Terrace when he noticed appellant driving around the block. Angered by appellant's presence, Wiggins borrowed a gun from his friend, Antowine Baker, and fired several rounds into appellant's car.[4] Appellant drove off. He was not injured and told a police officer who encountered his bullet-ridden

---

[3] The witness who saw the shooter come out of the alley initially mistook him for Wiggins himself, whom she knew. She said the shooter and Wiggins had similar builds and that the shooter's hair appeared to be in dreadlocks pinned up under his ski mask. Wiggins's sister testified that appellant wore his hair in dreadlocks, which he sometimes pinned up.

[4] Baker testified at trial pursuant to a plea agreement and a grant of immunity from the government.

vehicle later that night that he did not know who had shot at him. But several evenings later, appellant allegedly found Wiggins at Marvin Gaye Park and ran after him wielding a semi-automatic handgun.[5] Wiggins was able to outrun appellant and escape. Later that same evening, Wiggins, Baker, and two other friends, all of them armed, drove to Field Place, where appellant lived, in an effort to find and kill him. Unable to locate appellant, however, the group disbanded without attacking anyone.[6]

A month later, on the morning of October 26, 2011, Myriah Simmons, appellant's former girlfriend[7] and mother of his daughter, had an upsetting encounter with Wiggins. Simmons testified that as she was leaving her home on Clay Street to walk her daughter to school, she saw Wiggins, who lived across the street, get into a truck and follow her and her daughter as they walked on Division Avenue to the school. When they arrived, Wiggins pulled up alongside her, stopped, rolled down his window, and silently stared at her for a few moments

---

[5] Another friend of Wiggins claimed at trial to have observed this.

[6] Baker testified to this second, abortive attempt by Wiggins to shoot appellant. The prosecution presented no evidence that appellant knew of it.

[7] Simmons is not the same ex-girlfriend whose relationship with Wiggins sparked the feud between the two men.

before driving away. After dropping off her daughter, Simmons reported this encounter to appellant's mother, Shannon Johnson. Simmons heard Johnson phone Wiggins and angrily tell him to leave Simmons and her granddaughter alone "because they had nothing to do with it." A little later that morning, Simmons spoke by phone with appellant and told him about her encounter with Wiggins. Appellant, sounding angry, told Simmons to get some clothes from her house and not go back there.

It was this same morning that Wiggins was shot and killed. In addition to relying on the foregoing evidence of appellant's motive and hostility toward Wiggins, the prosecution sought to link appellant directly to the murder with three other pieces of evidence. First, cell phone tower records introduced through an expert witness placed appellant in the general vicinity of the crime scene around the time of the murder. The data did not pinpoint appellant's location or establish that he was at or particularly close to the crime scene, however; indeed, it did not exclude the possibility that he was at home or elsewhere in his own, relatively nearby, neighborhood.

Second, the government elicited Simmons's testimony before the grand jury about a phone conversation between appellant and his mother shortly after the

shooting. Simmons testified that she was with appellant's mother and heard her tell appellant that the police were at Clay Street and Division Avenue and ask him what had happened; and she heard appellant's voice on the phone, answering, "[I]t's tooken [*sic*] care of. I did it. It's okay." At trial, Simmons claimed all this was a lie she told because the police threatened her that "if [she] didn't tell them what they wanted to hear, [she] was not going home to [her] child." The police denied this, and Simmons's generally uncooperative demeanor on the witness stand did nothing to enhance the credibility of her recantation. Nonetheless, there was no record of the phone conversation in appellant's cell phone records, an inconsistency the government could not explain, except by suggesting (without evidence) that appellant might have used another, unidentified phone when he spoke with his mother.

Third, a jailhouse informant named Brandon Terry testified that appellant told him the reason he was incarcerated when they happened to be housed in the same unit of the D.C. Jail in February 2012. According to Terry, appellant said that after "a guy named Dre had shot his car up," he went looking for him with a

friend named "Phil" who had a gun, and when they found Dre, he "do what he got to do."[8]

The defense attacked this as a fabrication by an unreliable witness who readily admitted that he told prosecutors about appellant's statement because he hoped for a big reward—a substantial reduction of the lengthy prison sentences he had received following convictions in the District of Columbia and Maryland for murder and other crimes. Moreover, there were additional reasons to be suspicious of Terry's testimony. On two occasions in March 2012, shortly after he allegedly heard appellant incriminate himself, Terry met with prosecutors as part of his effort to provide useful information in exchange for a favorable plea deal in his then-pending murder case. Although Terry had every incentive to report appellant's murder confession in these debriefing sessions, he inexplicably made no mention of it. But on April 11, 2012, a month after his debriefing ended, Terry was given a new cellmate at the Jail. This new cellmate turned out to be none other than Wiggins's friend Antowine Baker, who at the time was cooperating with the prosecution of appellant in exchange for a plea deal of his own. Shortly after

---

[8] Terry also testified that appellant later accused him of snitching and threatened him when they were transported to Superior Court for appellant's trial in the same Department of Corrections van and fortuitously seated next to each other.

Baker became his cellmate, Terry notified the prosecutors that he had new information to offer. The prosecutors agreed to meet with Terry for a third debriefing session in May 2012, and only then did Terry claim to have heard appellant incriminate himself in Wiggins's murder back in February. Appellant contended at trial that Terry simply fabricated this claim based on what he learned from his cellmate Baker.[9]

## II.

Proof of appellant's motive and opportunity to kill Wiggins was a central component of the case against him at trial; as the government argued in closing, when the jury understood "why" Wiggins was killed, then it would "know beyond a reasonable doubt . . . who" killed him. "[T]here's only one person," the prosecutor told the jury in rebuttal argument, "who on October 26 had a motive

---

[9] Appellant sought to further impeach Terry with prior false statements he had made during the investigation of his own murder case, but the trial court precluded that line of cross-examination. As discussed below, appellant contends this ruling was erroneous.

and a means and a reason to want to kill Andre Wiggins . . . . And that one person you know is Terry Johnson."[10]

Appellant sought to blunt the force of the government's motive argument and raise a reasonable doubt about his identification as Wiggins's killer by introducing evidence that other men with animosity toward Wiggins had a comparable motive and the opportunity to commit the murder. We have held that defendants have a constitutional right to present "third-party-perpetrator" evidence of this sort; for it to be admissible, it need only "tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense."[11] The "focus" of this standard for admissibility "is not on the third party's guilt or innocence, but on the effect the evidence has upon the defendant's culpability, and . . . it need only *tend* to create a reasonable doubt that the defendant committed the offense. . . . [T]here is no requirement that the proffered evidence must prove or

---

[10] Appellant contends the trial court erred in overruling his objection to this assertion.

[11] *Winfield v. United States*, 676 A.2d 1, 4 (D.C. 1996) (en banc) (internal quotation marks omitted).

even raise a strong probability that someone other than the defendant committed the offense."[12]

> To satisfy the "reasonable possibility" standard of admissibility,

> > a defendant must proffer some evidence, either circumstantial or direct, of a third party's actions, motives, opportunity, statements or declarations against penal interest. Such evidence may consist of one fact or circumstance, or a set of facts or circumstances, which, in the aggregate, establishes the necessary link, connection or nexus between the proffered evidence and the crime at issue.[13]

If the argument for admissibility is based on a specific third party's motive, the defense ordinarily must proffer that this person also had the "practical opportunity" to commit the crime.[14] "Practical opportunity" means that the third party had "at least inferential knowledge of the victim's whereabouts" and was not incarcerated

---

[12] *Id.* (emphasis in the original; internal quotation marks and citations omitted).

[13] *Boykin v. United States*, 738 A.2d 768, 774 (D.C. 1999) (internal quotation marks omitted).

[14] *Winfield*, 676 A.2d at 5 ("[*W*]*ithout more*, . . . [s]imple proof of motivation of others to commit the crime ordinarily does not create a 'real possibility' that any of them was the perpetrator. . . . [T]he trial judge ordinarily may exclude evidence of third-party motivation unattended by proof that the party had the practical opportunity to commit the crime[.]") (emphasis in the original).

or otherwise physically unable to commit the crime; proof actually placing the third party at or near the crime scene is not required.[15] The reasonable possibility standard, then, "insures the exclusion of evidence that is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt."[16]

The trial court precluded appellant from introducing his proffered third-party perpetrator evidence. The court deemed the proffered evidence "too speculative" to indicate that a third party had a practical opportunity to kill Wiggins.[17] Appellant contends that the court erred in finding his proffers insufficient, and we agree.[18]

---

[15] *Id*. at 5–6; *see also Jordan v. United States*, 722 A.2d 1257, 1261 (D.C. 1998). In other words, evidence of a third party's motive ordinarily is not relevant if the third party could not have committed the offense because he had no access to the scene of the crime or could not have known the location of the victim. Of course, even if the motivated third party could not have committed the offense himself for these reasons, his motive might be relevant if there were evidence that he had an agent or accomplice who did have the necessary access and knowledge.

[16] *Winfield*, 676 A.2d at 5 (internal quotation marks omitted).

[17] *See id*.

[18] Even where a defendant's proffer of third-party perpetrator evidence satisfies the requirements for admissibility, the trial court retains discretion to exclude or circumscribe the evidence if its probative value is substantially outweighed by the risk of unfair prejudice or to prevent jury confusion, the

*(continued…)*

Appellant identified two potential third-party perpetrators of Wiggins's murder and made a separate proffer as to each. The two men were Silky Gates and "Quannie" Payne.

Appellant learned about Silky Gates from the government, and his proffer included the following information.[19] Four days before Wiggins was murdered, Wiggins robbed and pistol-whipped Gates during or shortly after a street dice game. This happened just a few blocks away from where Wiggins lived and was killed. Gates, who told the grand jury that he grew up with Wiggins's brother Darrell and still frequented the neighborhood from time to time, recognized

---

*(continued…)*
unnecessary cumulation of evidence, or a distracting "trial-within-a-trial." *Winfield*, 676 A.2d at 5, 7; *see also Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc) (adopting Fed. R. Evid. 403); *Bruce v. United States*, 820 A.2d 540, 545–46 (D.C. 2003) (affirming trial court's decision to exclude *Winfield* evidence on Rule 403 grounds). The trial court did not exclude appellant's evidence for those reasons, however. On the record before us, we do not perceive that they would be applicable, but we do not foreclose the discretionary consideration of Rule 403 grounds for limiting the presentation of third-party perpetrator evidence in the proceedings on remand.

[19] The government informed appellant about Gates in January 2013, just five weeks before trial, though the police identified him as a suspect within a week of Wiggins's murder and he testified before the grand jury (without asserting his privilege against self-incrimination) in June 2012. As we discuss below, appellant argues that the trial court should have sanctioned the government because his defense was prejudiced by the lateness of the disclosure.

Wiggins as his assailant. Wiggins stole Gates's money and a ring that Gates claimed was worth $6,000. Gates was hospitalized for the injuries Wiggins inflicted, which included a head wound requiring ten staples to close.

Instead of reporting the robbery to the police, Gates decided to handle the matter himself. The day after the robbery, he enlisted Wiggins's brother Darrell to help him recover his stolen property. Wiggins, however, told Darrell he had nothing to do with the robbery. The following day—two days before Wiggins was murdered—Gates and his own brother visited Wiggins's house in an unsuccessful attempt to confront him there in person. On the day Wiggins was shot, appellant proffered, Gates was at liberty and could have returned to confront him. Moreover, appellant proffered that a witness previously had seen Gates with a gun and would testify that Gates had access to firearms through his brothers. Finally, Gates told the police and the grand jury that he was in Prince George's County, Maryland, at the time of the murder, but when Wiggins's brother Darrell telephoned him on the afternoon of the shooting, Gates told him he was in New York when Wiggins was shot.

In addition to the above information, appellant proffered that Gates was rumored to have put a $20,000 bounty on Wiggins's head, and that someone

nicknamed "Meaty" told Wiggins's father he saw Gates commit the murder.[20] For present purposes we attach no weight to either of these facts because appellant could not proffer any witness who claimed actually to have heard Gates offer a bounty nor assure the court that he would present Meaty as a witness at trial.

Regarding Quannie Payne, appellant proffered the following information[21]: Payne lived in the same neighborhood as Wiggins, and the two men associated with each other and even shared the same girlfriend. Payne was present when Wiggins robbed and pistol-whipped Gates and voiced his disapproval of that conduct. As a result, the relationship between Payne and Wiggins became acrimonious in the days preceding the latter's murder. During that period, Wiggins assaulted Payne and robbed him of his motorbike. After Wiggins was killed, Payne cut off his dreadlocks—a significant alteration of his appearance evincing consciousness of guilt, appellant argued, in light of the testimony that Wiggins's assailant wore his hair in dreadlocks.

---

[20] Wiggins's father reported this to the police. However, Meaty also told people that he saw appellant shoot Wiggins or that he did not know who did the shooting.

[21] It appears that appellant independently learned about Payne after the government informed him about Gates. However, the government thereafter corroborated, to an extent, appellant's proffer regarding Payne.

We have no difficulty concluding that appellant's evidentiary proffer with respect to Silky Gates passed muster under *Winfield*'s "reasonable possibility" test for admissibility of third-party perpetrator evidence. Appellant proffered that Gates had a strong retributive motive arising from Wiggins's very recent robbery and pistol-whipping of him, and that Gates made at least one attempt to confront Wiggins about it at his residence just two days before the murder. This evidence of Gates's motive was comparable to the evidence of a violent feud between Wiggins and appellant on which the government relied to show appellant's motive. That Gates demonstrably knew exactly where Wiggins lived showed that he had at least inferential knowledge of Wiggins's whereabouts on the morning Wiggins was killed on the street right outside his home. And since Gates was at liberty and was capable of going there that morning to act on this knowledge, he had the requisite practical opportunity to commit the crime. The fair implication is that Wiggins, like the victim in *Winfield*, was "easily accessible" to his enemies.[22] Appellant's proffer was not "too speculative with respect to the third party's guilt"[23] merely

---

[22] With respect to practical opportunity, the defense proffer in *Winfield* was merely that the alleged third-party perpetrator "was at liberty and the killing occurred in the public courtyard of a housing project where [the victim] was easily accessible to those who [might] want to harm her." 676 A.2d at 6. Appellant's proffer of Gates's practical opportunity compares favorably to the one this court found sufficient in *Winfield* itself.

because appellant could not proffer evidence of Gates's movements or his location near the scene of the crime on the morning of October 26, 2011.[24] Furthermore, the strength of appellant's proffer was enhanced with the additional facts that Gates demonstrably intended to handle his dispute with Wiggins himself without involving the police; that he had access to firearms and thus had the means to commit the murder; and that Gates seemingly lied about his whereabouts at the time of the murder, either to Wiggins's brother or to the police and the grand jury, suggesting consciousness of guilt. Considering the proffered evidence in the aggregate, we think it undeniably "tend[ed] to indicate some reasonable possibility" that it was Gates who murdered Wiggins.[25]

The proffer as to Quannie Payne was not as robust as the Gates proffer, but it too exceeded the threshold for admissibility established by *Winfield*. Appellant proffered that Payne, whom Wiggins had assaulted and robbed, also had a strong contemporaneous motive to take revenge on Wiggins. Because Payne lived in the

---

*(continued…)*

[23] *Id.* at 5 (internal quotation marks omitted).

[24] Indeed, the defense proffer in *Winfield* did not describe the alleged third-party assailant's location at the time the victim in that case was murdered. *See* 676 A.2d at 3.

[25] *See id*. at 5 (internal quotation marks omitted).

neighborhood, associated with Wiggins, and shared a girlfriend with him, it is a fair inference that Payne knew where Wiggins lived and knew that Wiggins could be found in the street outside his residence. So far as appears, nothing prevented Payne from confronting Williams there on October 26, 2011. And the proffer was enhanced by the additional fact that Payne cut off his dreadlocks shortly after the murder, which a jury might interpret as evincing consciousness of guilt. Taken *in toto*, this was proffer enough; even if the question is close, "the trial court must resolve close questions of admissibility in this setting in favor of inclusion, not exclusion."[26]

Accordingly, we hold that the trial court erred in rejecting appellant's proffers as insufficient to support the admission of third-party perpetrator evidence. We cannot conclude that the error was harmless. Taking the proffered evidence at face value—the government offered little in the way of rebuttal to it, and in any event we must view the evidence as favorably to appellant as the jury reasonably might have done—it would have served a dual purpose for the defense. First, unrefuted evidence of another plausible perpetrator in itself could have justified a

---

[26] *Id.* at 6.

reasonable doubt as to appellant's guilt. That is *Winfield*'s basic premise.[27] Second, the probative value of a defendant's motive in establishing the perpetrator's identity is diminished if that motive was not unique to the defendant, but rather was shared by others; so the evidence that Gates and Payne had a motive to kill Wiggins logically would have lessened the probative value of the evidence that appellant had such a motive. The evidence about Gates and Payne would have made it impossible for the government to urge the jury to find appellant guilty because he was the "only" person "who on October 26 had a motive and a means and a reason to want to kill Andre Wiggins." And this would have required the government's other, limited evidence of appellant's guilt—riddled as it was with potentially serious deficiencies—to bear more of the weight of its case.[28] For these reasons, we think it reasonably probable the jury's verdict would have been different had appellant been allowed to introduce the third-party perpetrator

---

[27] *See id*. at 4.

[28] To recapitulate it briefly, the other evidence against appellant came from (1) a jailhouse informant who was impeached with his bias to curry favor with the government and the suspicious circumstances under which he produced his information against appellant; (2) the grand jury testimony of appellant's former girlfriend, which she disavowed at trial and which was inconsistent with appellant's phone records; and (3) cell phone tower records that had too little to say about appellant's location on the morning of Wiggins's murder.

evidence he proffered. He therefore is entitled to reversal of his convictions and a new trial.

## III.

We turn to appellant's other claims. One of them is moot—his contention that the trial court committed reversible error by permitting the government to make a false and misleading claim in rebuttal argument when it asserted that appellant was the only person who had reason and means to kill Wiggins.[29] Since we are given no reason to think the same issue will arise in the retrial we are requiring on other grounds, we need not address this contention. Our reversal does not moot appellant's two remaining claims, however.

## A.

Appellant argues that the trial court erred in declining to impose sanctions after finding the government had violated its disclosure obligations under *Brady v.*

---

[29] Adhering to its conclusion that appellant's proffers did not show that either Gates or Payne had the practical opportunity to commit the murder, the trial court overruled appellant's objection to the government's assertion.

*Maryland*[30] by withholding, for over a year, the evidence in its possession implicating Silky Gates in Wiggins's murder. The police knew by November 2011 that Andre Wiggins had robbed and pistol-whipped Gates not long before the murder; that Gates had sought to handle the matter himself without involving the police; and that Gates was said to have put a $20,000 bounty on Wiggins. According to Wiggins's father, the police also knew "Meaty" told him he saw Gates shoot his son. The prosecutor learned about Gates by June 2012, which was when he testified before the grand jury. Yet the government did not disclose any of the Gates evidence it had acquired until January 2013, when appellant's trial was only five weeks away. The government offered no excuse for its delay. The trial court agreed that the government had breached a duty to make timely disclosure of the exculpatory Gates evidence.[31]

---

[30] 373 U.S. 83 (1963).

[31] *See Vaughn v. United States*, 93 A.3d 1237, 1262–63 n.29 (D.C. 2014) ("[P]rior to trial, the government must disclose information [favorable to the defense] that is 'arguably' material.") (citing *Boyd v. United States*, 908 A.2d 39, 61–62 (D.C. 2006), and *Miller v. United States*, 14 A.3d 1094, 1109 (D.C. 2011)); *see also Miller*, 14 A.3d at 1108 ("[D]isclosure of exculpatory information is to be made 'at the earliest feasible opportunity' and 'as soon as practicable following the filing of charges'") (quoting the American Bar Association's Standards for Criminal Justice, The Prosecution Function, §§ 11–2.1 (c) and 11–2.2 (a) (2d ed. 1980)); *Edelin v. United States*, 627 A.2d 968, 970 (D.C. 1993) ("[T]he prosecution must disclose exculpatory material at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case[.]") (internal quotation marks omitted). The tardy disclosure of

*(continued…)*

After the trial court denied appellant's requests for a continuance of the trial to enable him to investigate the Gates information, he moved for sanctions to remedy the prejudice to his defense from the loss of evidence caused by the government's excessive delay in disclosing what it knew about Gates. Appellant claimed the evidence that had been lost included testimony from witnesses who, if contacted earlier, might have undermined Gates's alibi or confirmed that he put out a contract on Wiggins's life, and cell phone tower records that, had they not been destroyed in the interim, might have established Gates's approximate location when Wiggins was shot. The sanctions that appellant proposed included dismissal of the indictment or admission of the *Winfield* evidence along with a jury instruction permitting an adverse inference to be drawn against the government because it had withheld the Gates information for more than a year.

The court declined to impose any sanction for two reasons. First, the court deemed it incongruous to allow appellant to present a *Winfield* defense as a remedy for "this particular *Brady* violation" when it had determined that the proffered

---

*(continued…)*
exculpatory evidence amounts to a *Brady* violation of a defendant's right to due process of law if there is a reasonable probability that the result of the trial would have been different (in favor of the defendant) had there been earlier disclosure to the defense. *See Mackabee v. United States*, 29 A.3d 952, 959–60 (D.C. 2011); *Odom v. United States*, 930 A.2d 157, 159 (D.C. 2007).

evidence was insufficient to support that defense. Second, the court concluded appellant had not been prejudiced by the lateness of the government's disclosure because it appeared appellant already knew about the rumored bounty—while he was incarcerated awaiting trial, the government proffered, appellant told a government witness he had heard about a "$20,000 hit" on Wiggins that was "related to some gambling game," though the monetary reward was not why he shot Wiggins.[32]

We think neither of these reasons constitutes adequate justification for the denial of sanctions. We have held that appellant's proffer regarding Gates was sufficient to support his presentation of a third-party perpetrator defense. The Gates evidence was material enough that the government was required to disclose it under *Brady*, and the government's delay in doing so plausibly may have led to a loss of exculpatory evidence that would have influenced the jury to acquit appellant. The proffer that appellant had heard there was a $20,000 bounty on Wiggins does not get the government off the hook for its tardiness—for not only was the proffer unsubstantiated, but even if it is true that appellant heard there was

---

[32] The government did not name the witness who reported this statement; presumably, it was Brandon Terry. Terry was not asked about this statement at trial, however.

a bounty, that does not mean he or his defense counsel knew, or could have found out on their own, about Silky Gates and the substance of all the exculpatory information suppressed by the government. The undisputed fact is, the defense did *not* know who supposedly put out a contract on Wiggins and had *not* heard of Gates prior to the government's belated disclosure in January 2013. The record does not suggest that the defense pretrial investigation was less than diligent, or that appellant should have learned of Gates's involvement with Wiggins without the government's help. It was the duty of the government to disclose that information without undue delay, and the government is responsible for the consequences of its failure to do so; it cannot shift the blame to the defense.

In the proceedings on remand, therefore, appellant may renew his request for sanctions to remedy any prejudice to his defense caused by the government's dilatoriness in turning over the Gates information. Whether to impose a sanction, and what an appropriate sanction would be, are questions committed to the trial court's discretion.[33] We do not suggest that a remedial sanction is mandatory.

---

[33] As this court explained in *Odom*, a trial court has broad discretion to fashion "appropriate remedial sanctions for the government's failure to make timely disclosure of apparently material, exculpatory evidence as the Constitution requires," with "the sole limitation being that the sanction be just under the circumstances." 930 A.2d at 158–59 (quoting *Allen v. United States*, 649 A.2d 548, 552 (D.C. 1994). So, for example, the trial court in the present case would

*(continued…)*

There are many considerations that might influence the decision whether to impose one. At the threshold, appellant must make a credible showing of substantial prejudice to his defense attributable to the government's delay. If prejudice is shown, the selection of a just remedy should take into account both its effectiveness and its impact on the fairness and integrity of the trial.

**B.**

Lastly, appellant contends the trial court erred in precluding him from cross-examining jailhouse informant Brandon Terry about lies he told police and medical professionals in November 2011 during the investigation of his own murder case. Appellant proffered that Terry first lied to hospital staff when he said he was injured while cutting chicken instead of admitting he had been stabbed. He later told this same lie to police and falsely denied involvement in a shooting in which two persons were killed. Although Terry subsequently admitted his culpability, appellant argued that his false statements were germane to his cross-examination

---

*(continued…)*
have "discretion to allow [appellant] to introduce otherwise inadmissible exculpatory hearsay in order to remedy a perceived *Brady* violation that has impeded [appellant] from presenting the declarant's exculpatory testimony at trial." *Id.* at 159. *See also Vaughn*, 93 A.3d at 1267.

for bias because they showed that Terry would lie about a murder in order to escape or reduce his punishment. The court disagreed that this would be proper bias cross-examination and precluded it as irrelevant.

It was not irrelevant, however. A witness's past falsifications are relevant and admissible in cross-examination for testimonial bias if they tend to make it more likely that the asserted bias is leading the witness to lie on the witness stand.[34] That was so here: Terry's past fabrications demonstrated his willingness to lie to avoid being punished for murders he had committed, and hence tended to make it more probable that the same motivation (the existence of which was undisputed) actually had led him to lie again by fabricating appellant's confession.

The government does not seriously dispute the relevance and permissibility of appellant's proposed cross-examination of Terry. It argues, however, that the trial court, having allowed appellant wide latitude to establish that Terry was biased for the reasons claimed, had discretion to preclude a line of cross-examination that would have been cumulative, only minimally probative, and confusing to the jury. But the court did not purport to make such a discretionary

---

[34] *See Coates v. United States*, 113 A.3d 564, 573–74 (D.C. 2015); *see also Longus v. United States*, 52 A.3d 836, 852–54, 854 n.29 (D.C. 2012).

ruling; it deemed the proposed examination irrelevant as a matter of law. Nor are we persuaded to hold as a matter of law that questioning Terry about his false exculpatory statements when he was facing murder charges would have been cumulative, minimally probative, or confusing. A defendant is entitled to elicit not only the witness's motive but also evidence of how the witness responded to that motive—*particularly* if the witness responded to it by lying. And in fact, though there was ample evidence of Terry's motive to curry favor with the government by implicating appellant, the court's ruling excluded the only proof that this motive actually did lead Terry to lie. His lies cannot be dismissed out of hand as trivial or tangential, either. To be sure, there is a difference between lying to exculpate oneself and lying to inculpate another. But even so, as this court has observed in other contexts, "[i]f a witness is willing to lie about a murder, a jury may well conclude that [he] is likely to be willing to lie about anything. More particularly, if [he] has lied about one murder, there may be little if any reason to credit [his] testimony about a different murder."[35]

The trial court's refusal to allow appellant to question Terry at all about "facts indicative of [his] bias from which the jury could reasonably draw adverse

---

[35] *Bennett v. United States*, 797 A.2d 1251, 1255–56 (D.C. 2002).

inferences of reliability" was constitutional error—a violation of appellant's Sixth Amendment right of confrontation.[36] "While that right is subject to reasonable limits imposed at the discretion of the trial judge, the exercise of such discretion cannot justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony."[37]

Consequently, at a new trial, appellant presumably will be entitled to pursue his proposed cross-examination of Terry about lies he told the police and others to avoid being prosecuted for murder. The trial judge will have discretion to impose reasonable limits on this line of cross-examination, but we see no reason on the present record to foreclose it altogether.

## IV.

Appellant's convictions are reversed and his case is remanded for a new trial in accordance with the foregoing discussion.

---

[36] *Coates*, 113 A.3d at 573 (quoting *Longus*, 52 A.3d at 852).

[37] *Id.* (internal quotation marks and citations omitted).