*Notice:* This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-847

DONALD R. HAIRSTON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-9447-16)

(Hon. Danya A. Dayson, Trial Judge)

(Submitted September 22, 2021                    Decided December 9, 2021)

*Mindy Daniels* filed a supplemental brief and the reply brief for appellant. *Samia Fam*, *Jaclyn S. Frankfurt*, and *Lee R. Goebes*, Public Defender Service, filed the opening brief.

*Michael R Sherwin*, Acting United States Attorney at the time, and *Elizabeth Trosman*, *Eizabeth H. Danello*, *Alicia Long*, *John Timmer*, and *Anne Y. Park*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON,[*] *Associate Judge*, and NEBEKER, *Senior Judge*.

---

[*] Judge Thompson was an Associate Judge of the court at the time of submission. Although her term expired on September 4, 2021, she will continue to serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.). She was qualified and appointed on October 4, 2021, to perform judicial duties as a Senior Judge and will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

THOMPSON, *Associate Judge*: A jury convicted appellant, Donald R. Hairston, of first-degree premeditated murder while armed, first-degree felony murder while armed, first-degree burglary while armed, three counts of possession of a firearm during a crime of violence, unlawful possession of a firearm (felon in possession) ("UF"), stalking, and violation of a temporary protective order, all in connection with the June 18, 2016, shooting death of Stephanie Goodloe. In this appeal, appellant contends that the trial court reversibly erred by admitting several hearsay statements by Goodloe, including a number of testimonial hearsay statements, under the so-called forfeiture-by-wrongdoing doctrine. Appellant also argues that the trial court abused its discretion by not dismissing the indictment or imposing one of the sanctions requested by the defense after the court found that the government violated its obligations under *Brady v. Maryland*[1] by failing to timely disclose information about an individual who realized a financial benefit from Goodloe's death. In addition, appellant argues that even if the court does not reverse his convictions, certain of them merge. For the reasons that follow, we affirm the judgments of conviction but remand for the trial court to vacate the convictions that merge.

---

[1] 373 U.S. 83 (1963).

## I. Factual and Procedural Background

The government's evidence at trial established that for many years prior to 2016, appellant and Goodloe were in a romantic relationship and lived together in Goodloe's home on Kentucky Avenue, S.E., along with Goodloe's daughter, S.F., and Goodloe's brother. Appellant and S.F. developed a father-daughter-like relationship, and appellant continued to pick S.F. up from school and take her on outings even after appellant and Goodloe broke up in 2015 and appellant moved out of the home. The relationship between appellant and Goodloe continued to deteriorate and included, for example, an incident in public in which a witness saw appellant repeatedly spit on Goodloe and push her in the chest. On June 6, 2016, Goodloe obtained a temporary protection order ("TPO") that directed appellant not to stalk or contact Goodloe, and to stay away from her. The TPO, which was served on appellant on June 8, 2016, gave notice that Goodloe and appellant were due in court on June 20, 2016 — the Monday after Goodloe's murder — for a hearing on Goodloe's petition for a civil protection order ("CPO"). The evidence at trial showed that, notwithstanding the TPO, appellant continued to call and send text messages to Goodloe (a total of 104 times from June 3 to June 17, 2016). In a number of the messages, appellant begged Goodloe not to cut off his contact with

S.F. The last of the messages from appellant to Goodloe came on June 17 at 1:37 p.m.; the message was, "No more."

At about 1:22 a.m. on June 18, 2016, Goodloe was shot by an intruder and killed as she lay in her bed. S.F., who was eleven years old at the time, was in bed in her nearby bedroom with the door open. S.F. testified (and the jury heard a recording of her 911 call statements) that she heard gunshots and Goodloe's scream, and then saw appellant "walk out" and pause in the doorway of her bedroom. S.F. testified that she was certain that the man she saw was appellant. S.F. further testified that she had two dogs, who always barked whenever anyone approached or entered the house other than its occupants and appellant, but she heard no barking that night.[2]

---

[2] Other evidence as well pointed to appellant as the murderer. A neighbor, testified that she, too, heard no barking from the Goodloe's dogs around the time of the shooting. There was no forced entry into the home. A license plate reader on Pennsylvania Avenue, S.E., which was about four minutes away from Goodloe's house on the direct route between Goodloe's house and the house where appellant resided in District Heights, Maryland, captured the tag of a vehicle belonging to appellant's girlfriend, to which appellant had the keys, at about 1:29 a.m. on June 18, minutes after the shooting. There was no activity or location information on appellant's cell phones during the hour between 12:32 a.m. and 1:39 a.m. on June 18, 2016, when Goodloe was shot. Appellant's phone calls and text messages to Goodloe, which had been almost incessant through June 17, 2016, stopped on that day; there were no more on June 18. And the evidence showed that appellant had threatened harm to Goodloe and was upset about the TPO Goodloe had obtained.

During pre-trial proceedings, prosecutors moved for leave to introduce into evidence several statements that Goodloe made before her death, in which she complained that appellant had slashed the tires of her car and banged incessantly on her front door; had snatched her house keys from her door; and, on June 17, 2016 — the day before she was fatally shot — had threatened to send "Al and them after [her]." Prosecutors argued that the statements were admissible under *Giles v. California*, 554 U.S. 353 (2008), and *Devonshire v. United States*, 691 A.2d 165 (D.C. 1997), because, in killing Goodloe, one of appellant's purposes was to keep her from appearing at the scheduled June 20 CPO hearing (where she could give testimony about appellant's violation of the TPO and testimony in support of a longer-term restraining order that would block appellant's access to S.F.). The trial court found "by a preponderance of the evidence that the murder was . . . at least in part motivated by [appellant's] desire to keep [Goodloe] from going forward with the CPO." The court therefore ruled that Goodloe's hearsay statements would be admissible, and, during trial, the hearsay statements were admitted through 911 recordings, body-worn camera footage, copies of text messages, and the testimony of police officers and friends and relatives of Goodloe.

Another matter first raised pre-trial related to a defense motion to sanction the government for failure to reveal information about Arlene Petty. As described in a stipulation that was eventually read to the jury, Petty was a friend of Goodloe, who, after Goodloe's murder, established a GoFundMe account ostensibly to receive contributions for the benefit of S.F. In December 2017, police arrested Petty on fraud charges, based on evidence that she had diverted almost $30,000 from the GoFundMe account into a personal bank account she had opened shortly before Goodloe's murder, and had used the money for her own personal expenses. The defense's *Brady* motion informed the court that the defense had stumbled upon this information itself in March 2018 (about three weeks before appellant's trial commenced) and argued that the information showed that Petty had a motive to murder Goodloe (or to have someone else murder her). The trial court reasoned that "[t]he fact that someone else has been benefited from the decedent's death arguably could provide motive" for Goodloe's death and that the information fell within *Brady*. However, after hearing and crediting testimony from the detective who led the fraud investigation, and after hearing the representations of the homicide prosecutor and those of the Assistant United States Attorney ("AUSA") who was prosecuting the fraud case against Petty, the court found that there had been no bad faith and that the failure to timely provide the information to the defense was the result of the various individuals not having seen the "connections"

between the homicide and fraud cases. The trial court declined to grant the defense motion to dismiss the indictment as a sanction, but took other steps[3] that the court determined "g[ot] Mr. Hairston to the point that he would have been absent the Brady violation" and "cured" any prejudice.

After the jury convicted appellant on all charges, the trial court sentenced appellant to 540 months of imprisonment for the murder and to lesser, concurrent terms of imprisonment for most of the other offenses, but to consecutive terms for the UF, stalking, and TPO-violation convictions. This appeal followed.

## II. Forfeiture by Wrongdoing

"Under the forfeiture-by-wrongdoing doctrine, a defendant forfeits his Sixth Amendment right to be confronted by a witness against him, as well as his

---

[3] As described below, these included the offer of a trial continuance to give the defense time to investigate further, an order requiring the government to turn over to the defense the prosecutors' notes of their interview of the potential third-party perpetrator, a requirement that the parties develop a stipulation to be read to the jury detailing the facts the government knew about that person, and an instruction to the jury that the government had failed to timely disclose those facts to the defense.

objection to the introduction of hearsay, if he wrongfully procured the unavailability of that witness with the purpose of preventing the witness from testifying." *Roberson v. United States*, 961 A.2d 1092, 1095 (D.C. 2008). The forfeiture-by-wrongdoing exception "is grounded in the ability of courts to protect the integrity of their proceedings." *Giles*, 554 U.S. at 374 (internal quotation marks omitted). To successfully invoke the exception, the government must demonstrate that (1) the defendant engaged in wrongdoing that caused the witness's unavailability; and (2) did so in order "to prevent [the] witness from testifying." *Id.* at 361. The government's burden is to establish these "predicate facts by a preponderance of the evidence." *Roberson*, 961 A.2d at 1095-96 & n.8 (quoting *Devonshire*, 691 A.2d at 169). As to the purpose prong of the required showing, "[t]he government is not required to show that a defendant's sole purpose was to silence the declarant." *United States v. Cazares*, 788 F.3d 956, 975 (9th Cir. 2015); *accord United States v. Jackson*, 706 F.3d 264, 269 (4th Cir. 2013) ("[C]onstru[ing] the forfeiture-by-wrongdoing exception to apply even when a defendant has multiple motivations for harming a witness places us in accord with our sister circuits and with several state courts."); *United States v. Martinez*, 476 F.3d 961, 966 (D.C. Cir. 2007) (reasoning that a contrary rule would have the "perverse consequence" of "allowing criminals to murder informants and thereby prevent admission of the informants' statements—just so long as the criminal

could show that the intent was retaliation (which the criminal almost always could do)").

In reviewing a trial court's ruling on the admissibility of hearsay statements under the forfeiture-by-wrongdoing doctrine, "we review the court's factual finding that [the defendant] procured [the declarant's] unavailability to prevent h[er] from testifying for clear error and its ultimate decision to admit [the declarant's] statements for abuse of discretion." *Jenkins v. United States*, 80 A.3d 978, 997 (D.C. 2013); *see also Roberson*, 961 A.2d at 1095, 1097 (explaining that even where "the record is not all it might have been," we will defer to the trial court's prerogative to draw reasonable inferences and will not disturb the trial court's ruling on admissibility of testimonial hearsay statements under the forfeiture-by-wrongdoing exception unless the trial court's fact-finding was clearly erroneous).

In this case, appellant argues that the trial court erred in admitting Goodloe's unconfronted testimonial hearsay statements regarding the deflating of her tires on June 4, 2016, the snatching of her keys on June 8, 2016, and the threat appellant

made against her and that she reported to the police on June 17, 2016.[4]  Appellant argues that the record was insufficient to support a conclusion that appellant was motivated, even in part, out of a desire to prevent Goodloe from testifying at the CPO hearing. Appellant emphasizes that some of his text messages to Goodloe reference his intention to "see [Goodloe] in court"; that the trial court erroneously believed that the proffered evidence showed requests by appellant to Goodloe "not to go forward" with the CPO proceeding, while in fact there was no evidence that appellant ever asked Goodloe not to proceed with the CPO case; and that the threat against Goodloe on June 17 had nothing to do with the CPO hearing (and instead was in reference to what would happen if Goodloe continued to refuse to relinquish her interest in a vehicle that jointly titled in appellant's and Goodloe's names).

Appellant's arguments do not persuade us that the trial court clearly erred in inferring that Goodloe's murder "was . . . at least in part motivated by [appellant's] desire to keep [Goodloe] from going forward with the CPO."  To begin with, as the Supreme Court's opinion in *Giles* makes clear, especially where there is a pending proceeding relating to a restraining order, a history of domestic violence between the defendant and the deceased declarant can support an inference that the

---

[4]  Appellant argues that this hearsay report, i.e., that appellant "was threatening [Goodloe] in the hours leading up to her death, was devastating to [his] defense."

defendant who is charged with the declarant's murder had a purpose to make the declarant unavailable as a witness in that proceeding. The Supreme Court explained:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

554 U.S. at 377. *See also, e.g.*, *Crawford v. Commonwealth*, 686 S.E.2d 557, 564 (Va. Ct. App. 2009) (noting that in that portion of *Giles* "supported by a clear majority of the justices, the Supreme Court left open the possibility that a defendant's intention to prevent testimony might be inferred from the surrounding circumstances, such as in a case of ongoing domestic violence"); *People v. Banos*, 100 Cal. Rptr. 3d 476, 484-85, 492 (Cal. Ct. App. 2009) (holding that murder victim's prior testimonial statements about defendant's threats against her and restraining-order violations were admissible under the forfeiture-by-wrongdoing

exception because there was substantial evidence that defendant killed the victim — nine days before a scheduled hearing on a restraining-order violation — at least in part in order to prevent her from testifying against him); *State v. McLaughlin*, 265 S.W.3d 257, 272 (Mo. 2008) (rejecting the argument that the forfeiture-by-wrongdoing exception could not apply where the purpose of killing the witness was to keep her from testifying at a burglary/adult abuse trial and not to keep her from testifying at the trial for her own murder); *cf. State v. McKelton*, 70 N.E.3d 508, 546 (Ohio 2016) (reasoning that even though the record did not indicate that the murder victim was expected to testify against the defendant in a pending criminal proceeding, the defendant's purpose in killing her could be inferred from evidence indicating that he was trying to isolate the victim and prevent her from talking to authorities).

In the instant case, and as the trial court recognized, there were particular circumstances that support an inference that preventing Goodloe from going forth with the scheduled CPO hearing was at least a partial motive for the shooting on June 18, 2016. The trial court observed that appellant had been served with the TPO/CPO hearing notice just ten days before the murder; that some of appellant's "repetitive, frantic texts" to Goodloe in the days before the murder specifically referenced the scheduled June 20, 2016 CPO hearing; that appellant's text

messages expressed that he was distressed that Goodloe was trying to keep him from seeing S.F.; that appellant "believed the CPO outcome would be that he would not be able to see his daughter";[5] that appellant's last message — "no more" — came after Goodloe had ignored both his efforts at persuading her to reconcile with him[6] (something she would be unable to do with a stay-away order in place) and his increasingly frequent calls (e.g., five attempted contacts within a space of four minutes), seemingly prompting appellant to adopt what the court called a "different tactic"; and that the murder occurred less than 48 hours before the scheduled hearing.

Appellant emphasizes that the TPO did not order him to have no contact with S.F.; that even without a CPO in place, Goodloe could effectively prevent him from visiting with S.F. since appellant had no parental rights as to her; and that killing Goodloe would almost certainly mean that Goodloe's other relatives would

---

[5] Goodloe's cousin Kimberley Crump-Smith, who handed the TPO/hearing notice to appellant, testified at trial that appellant was angry upon receiving it in June (so much so that he reportedly went straight to Goodloe's house and snatched her keys from her front door) and was distressed at the prospect of having to stay away from S.F.

[6] E.g., "can u forgive me" and "I can change for you and [S.F.]" and "I need you in my life." Appellant argues that the trial court erred in finding that such messages post-dated his learning that Goodloe had obtained a TPO, but the record supports the trial court's observation.

cut off his access to S.F. — such that his desire to maintain his relationship with S.F. could not have been achieved by killing Goodloe to prevent her from going forward with the CPO hearing. But the trial court was not required to find that appellant's thinking included such rational analysis (and, in any event, there was no guarantee that once the CPO court heard testimony it would not impose even broader restrictions). Further, the trial court could reasonably infer (as we interpret its statements[7]) that appellant's post-June 8 "requests not to cut off the relationship" between S.F. and him were equivalent or tantamount to "requests not to go forward" with the CPO proceeding.

On the record before us, we cannot conclude that it was clear error or an abuse of discretion for the trial court to conclude that, in shooting Goodloe, appellant was motivated at least in part by the purpose of preventing her from testifying at the CPO hearing. "While other inferences are possible, we think that the foregoing facts in their totality permitted the trial court to find it more likely than not that" appellant had, as at least one purpose in murdering Goodloe, the purpose to keep her from going forward with and testifying at the imminent CPO hearing. *Roberson*, 961 A.2d at 1097.

---

[7] The court referred to "the timing of the murder itself which followed days of increasingly frequent requests not to go forward, requests not to cut off the relationship, ending with a text no more[.]"

### III.   *Brady* Sanctions

Appellant argues in his supplemental brief that upon the trial court's finding there was a *Brady* violation with respect to the information about Petty, dismissal of the case was the appropriate remedy or, absent that, an instruction to the jury that it could draw an adverse inference against the government.  For its part, for purposes of this appeal, the government does not dispute that, with respect to the information about Petty, it failed to comply with its obligation under *Brady* to timely disclose to the defense information that was favorable to the accused.  It argues, however, that no sanction beyond those imposed by the trial court was warranted because there was no "true" *Brady* violation — i.e., because appellant received the information in time to use it effectively at trial and could not demonstrate prejudice.

As the Supreme Court observed in *Strickler v. Greene*, 527 U.S. 263 (1999), "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict," i.e., unless the non-disclosed evidence

was material. *Id.* at 280-81. We have also said that there is no "true *Brady* violation" unless the information "was not disclos[ed] in sufficient time to afford the defense an opportunity for use." *Mackabee v. United States*, 29 A.3d 952, 959-60 & n.18 (D.C. 2011) (internal quotation marks omitted). "Whether to impose a sanction [for a *Brady* violation], and what an appropriate sanction would be, are questions committed to the trial court's discretion." *Johnson v. United States*, 136 A.3d 74, 85 (D.C. 2016).

In this case, after a delay in disclosure that the trial court found was a *Brady* violation but not the result of bad faith or willful misconduct,[8] the defense received the information in question about three weeks before trial began. The trial court suggested, effected, or urged the parties to accomplish a number of remedies to ensure that appellant would have a fair trial and in an effort to put the defense in the position it would have been in if the information had been disclosed in December 2017, i.e., when the Petty matter went from an investigation to a prosecution. The court said it would grant a continuance of the trial (to which the

---

[8] The court's no-bad-faith finding is a factual finding that we would review under a clearly erroneous standard if appellant had challenged it on appeal. *See Miller v. United States*, 14 A.3d 1094, 1120 (D.C. 2011). He correctly asserts that in the trial court, defense counsel alleged bad faith by the government, but on appeal he does not appear to challenge the court's finding of no bad faith.

government agreed) to give the defense additional time to investigate, but the defense rejected a continuance unless appellant was released from custody pending trial, a step the court said raised the separate issue of ensuring the safety of the community.

The court did, however, direct the government to make available to the defense government counsel's "notes regarding Ms. Petty's conversation with the [g]overnment," including the homicide prosecutors' notes of their debriefing of Petty, even though the notes were not subject to Super. Ct. Crim. R. 16 discovery. In addition, the court was informed that the government had disclosed the entirety of the Petty investigative file to the defense and had invited the defense to ask questions about it. The prosecutors represented that the file included Petty's bank records and that the government also gave the defense a work-product PowerPoint put together by the police showing where the embezzled GoFundMe account money went (such as to Goodloe's family to pay off the note on Goodloe's vehicle and to pay medical bills for Petty's children). The court was also made aware that

the government sought expedited approval to obtain statutory immunity for Petty

so that appellant could call her as a witness.[9]

Further, the court encouraged the parties to craft a stipulation about Petty

(which they did). The stipulation read to the jury was as follows:

> On May 27, 2016, three weeks prior to Stephanie Goodloe's murder, Arlene Petty opened a Wells Fargo checking account. This account would become a financial tool for stealing approximately $29,185. On May 27th, 2016, the newly-opened Wells Fargo account had a balance of $0. On June 18, 2016, Stephanie Goodloe was murdered while inside her home at 739 Kentucky Avenue, Southeast, Washington, D.C. If called, Arlene Petty would testify that she saw Ms. Goodloe at approximately 10:15 p.m. on June 17, 2016, when Ms. Goodloe dropped off Ms. Petty at Ms. Petty's home. Arlene Petty knew where Ms. Goodloe lived and knew who else lived with Ms. Goodloe. On June 20, 2016, Arlene Petty started a GoFundMe campaign stating that she was collecting money to help support [S.F.], Ms. Goodloe's daughter. However, at some point, Ms. Petty began stealing these funds for her own purposes. By August of 2016, Arlene Petty, who had $0 in that checking account in May 2016, was able to steal approximately $29, 185 through the GoFundMe Campaign following the murder of Stephanie Goodloe. With that stolen money, Arlene Petty bought a used car, paid back due rent, paid insurance and phone bills, paid

---

[9] Although counsel told the court on April 5, 2018, that the defense would "absolutely be calling [Petty] as a witness in this case," the defense did not call her as a witness.

> for auto repairs, purchased clothing, household items, make-up and food, and withdrew approximately $14,000 in cash.

In addition, the court told the jury:

> The Government did not disclose this information to the defense until March 26, 2018, although they had a duty to disclose the information in a timely fashion. You may consider the Government's failure to timely disclose the facts contained in -- of which I've taken judicial notice, contained in the stipulation, and give it as much weight as, in your judgment, it deserves.

The court did not limit appellant from requesting other remedies.[10]

In determining how if at all to sanction the government for the delayed disclosure of the information about the Petty embezzlement, the trial court had an "extremely broad" "range of available sanctions," with "the only real limitation being that a sanction must be just under the circumstances" and "appropriately address[] the violation." *Ashby v. United States*, 199 A.3d 634, 646 (D.C. 2019)

---

[10] The court also stated that the defense would be permitted to make a third-party perpetrator argument as to Petty, though the court did not regard that as a sanction because, in the court's view, the evidence to support it satisfied the low bar for so-called *Winfield* evidence in any event. *See Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc). The defense also argued that appellant's girlfriend, Talesha Lyons, could be a third-party perpetrator.

(internal quotations omitted). We are satisfied that the trial court reasonably determined that dismissal of the indictment (a sanction that appellant acknowledges is "severe") was not warranted and that the sanctions the court put in place in this case appropriately addressed the violation, particularly given the court's well-founded finding that the defense team did not make a persuasive case for how appellant's defense was prejudiced by the delay.[11] The trial court repeatedly asked appellant's trial counsel to articulate how the defense was prejudiced by the three-month delay in disclosure, what investigation the defense had initiated since receiving the information about Petty (on March 26, 2018), and what appellant would have done "that you weren't able to do." At one point, defense counsel responded that he "tried to investigate the men involved in Petty's life who may have assisted Petty in committing the fraud and perhaps the murder," "Petty's desperate financial condition," "where Petty spent her ill-gotten gains," and "any additional motive evidence for Petty to have murdered Goodloe." But, as described above, the court was aware of the government's representations that the defense team had received from the government Petty's bank records and the fraud-investigation file, which answered many of these questions. As to the goal

---

[11] The trial court commented that it had "never really gotten an answer to th[e] question" of what prejudice appellant had suffered from the delayed disclosure.

of discovering "any additional motive evidence for Petty to have murdered Goodloe," defense counsel offered nothing more than speculation as to why Petty's fraudulent use of the GoFundMe account provided a basis for thinking she might have had additional motives for murder. Such speculation was not sufficient to establish a true *Brady* violation warranting the relief appellant sought.[12] And even though appellant continues to argue prejudice from the delayed disclosure, he merely asserts that any information about Petty's possible accomplice(s) "had become stale" by the time of disclosure three months after Petty's arrest; he does not explain why that is so. We note, too, that defense counsel also candidly acknowledged that the defense team's inability to speak with Petty about the matters counsel identified was upon the advice of her counsel,[13] a circumstance that presumably would have been the same even if Petty's fraud arrest had been disclosed right after it happened.

---

[12] *Cf. Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (explaining that setting aside a conviction because disclosure "might have led to some additional evidence that could have been utilized" amounts to "mere speculation, in violation of the standards [the Court has] established").

[13] Defense counsel told the court, "we went to Ms. Petty's lawyer very early on and asked to speak with Ms. Petty and we were denied that. . . .. We, actually, probably did it before the Government ever tried to talk to Ms. Petty."

Appellant argues in his supplemental brief that if the defense team had known about Petty earlier, they would have been able to subpoena license plate readings for Petty's contacts (presumably, such information for her contacts around the time of the murder and the embezzlement of the funds). But the court heard testimony that license-plate-reader data are retained for only 90 days, so it appears that even if the information about Petty had been disclosed at the time of her arrest, or even when the police investigation of Petty began in March 2017, that information for Petty's contacts would not have been available. Ultimately, appellant acknowledges that "[w]hat was lost by the inability to conduct a timely investigation is unknown."

We also are satisfied that the disclosure about Petty was made at a time that permitted the defense to make effective use of the information about Petty and about the fraud detective's investigation. In questioning the fraud detective at trial, defense counsel wove into the questioning the theory that someone who steals nearly $30,000 might "take $10,000 and give it to somebody else who they worked with to commit that crime[.]" Counsel also "attack[ed] [the fraud detective's] investigatory process," *Ashby*, 199 A.3d at 646, eliciting from the detective that in his investigation, he did not look into the possibility that Petty had an accomplice. Further, although the court declined appellant's request for an adverse inference

instruction, the court permitted defense counsel to argue that an adverse inference could be drawn from the government's failure to timely disclose exculpatory information (and defense counsel argued to the jury that Petty "is every reason to doubt").

Given the speculative nature of the harm appellant cites from the delayed disclosure and the instruction the court gave the jury about the government's duty of disclosure, we will not disturb the trial court's determination that no further sanction was warranted for the government's delay in disclosing the information about Petty. We also see "little reason to believe that an earlier disclosure would have produced a different result . . .." *See id.* (reaching that conclusion despite the government's "grossly negligent" failure to disclose, noting inter alia that the defendants were able, in their closing statements, to "mak[e] note of the defense's inability to discover [a third party's] involvement until later in the case").

## IV.    Merger

Appellant's final argument pertains to merger. He argues that his conviction for first-degree premeditated murder while armed must merge with his conviction for first-degree felony murder while armed; that his conviction for first-degree burglary while armed must merge with his conviction for first-degree felony murder while armed; and that his three PFCV convictions must merge into a single PFCV conviction. The government concurs, and we agree, that the first-degree premeditated murder while armed and felony-murder while armed convictions merge and that one of them must be vacated upon remand to the trial court. *See Lee v. United States*, 699 A.2d 373, 382 (D.C. 1997) ("[F]elony murder convictions as to each victim merge with the first-degree murder convictions relating to that same victim."). We also agree with the government that if the felony murder conviction survives following merger, the predicate felony (first-degree burglary while armed) must merge with the felony-murder conviction. *See Matthews v. United States*, 13 A.3d 1181, 1191 (D.C. 2011) ("[A] person cannot be convicted of *both* felony murder *and* the underlying felony that supported the felony murder conviction."). We further agree with the parties that in that circumstance, the three PFCV convictions would merge into a single PFCV conviction. *See Appleton v. United States*, 983 A.2d 970, 978 (D.C. 2009) ("[M]erger of multiple PFCV convictions is proper if they arose out of a

defendant's uninterrupted possession of a single weapon during a single act of violence.") (internal quotation marks and brackets omitted).

However, if the premeditated murder conviction rather than the felony murder conviction survives merger, the predicate felony of armed burglary would remain intact, *see Mitchell v. United States*, 629 A.2d 10, 11 n.2 (D.C. 1993) ("[I]n light of our affirmance of appellant's conviction for first-degree murder, the felony murder conviction must be vacated, and we remand to the trial court to impose sentence for the burglary charge which survives without merger."), and the PFCV convictions associated with the premeditated-murder and armed-burglary convictions ("distinct acts," the second committed after reaching a "fork in the road" and the result of a "fresh impulse") would not merge. *Stevenson v. United States*, 760 A.2d 1034, 1035-37 (D.C. 2000); *see also Baker v. United States*, 867 A.2d 988, 1010 (D.C 2005) (no merger where there is a sufficient fork in the road between the armed burglary and the shooting). As the government points out, because the trial court imposed concurrent sentences for all the foregoing offenses, appellant's aggregate sentence would remain the same even after merger.

## V. Conclusion

For the foregoing reasons, we affirm the judgment of conviction but remand to the trial court to vacate the convictions affected by merger.

*So ordered.*