*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 17-CF-1344

DWAYNE HILTON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-2239-13)

(Hon. José M. López, Trial Judge)

(Argued November 18, 2020                Decided May 13, 2021)

*Debra L. Soltis*, with whom *Paul Y. Kiyonaga* and *Marcus T. Massey* were on the brief, for appellant.

*Peter S. Smith*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Sharon Donovan*, and *Alicia Long*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and FISHER, *Senior Judge.*

FISHER, *Senior Judge*: Appellant Dwayne Hilton was convicted of one count of first-degree murder of Mico Briscoe while armed, three counts of assault with intent to kill while armed (which included an assault of Kevin Johnson), and four

counts of possession of a firearm during a crime of violence. Appellant argues that the trial court abused its discretion by admitting identification testimony; erred in admitting evidence suggesting that the murder of appellant's friend, Robert Mallory, was a motive for the shooting in this case; and erred in denying his pretrial motion to present third-party-perpetrator evidence. Appellant also argues that the trial court erred in denying his motion for a new trial based on the government's failure to disclose evidence related to the subsequent murder of Kevin Johnson. We affirm, but conclude that appellant's four PFCV convictions merge into one.

## I.  Factual Background

On November 26, 2011, there was a fatal shooting outside of the Circle 7 convenience store on Mount Olivet Road, N.E., in the Trinidad neighborhood of Washington, D.C. Surveillance footage from the Circle 7 and the nearby Northeast Market showed the murder victim, Mico Briscoe, and his friends, Terrell Brent, Tevon Brent, Kevin Johnson, and Princeton Thorne, walking through the parking lot toward the Circle 7 store. Two men were trailing them and began jogging to catch up. As the first group arrived at the Circle 7, Terrell Brent entered the store and the others stayed outside. The two men trailing them started shooting. Mico Briscoe, Tevon Brent, Kevin Johnson, and Princeton Thorne ducked and ran to a

nearby alley. Briscoe later died of gunshot wounds to the chest. Kevin Johnson was struck in the arm, and both Tevon Brent and Princeton Thorne were grazed by bullets.

Northeast Market, Circle 7 Express, and Kovak's Liquor are all located along Mount Olivet Road, N.E., in a row running from west to east. West Virginia Avenue intersects with Mount Olivet Road and then, further east, Montello Avenue intersects with Mount Olivet Road. Both intersections are located to the west of the three stores. A red light camera captured a gold car traveling northbound on West Virginia Avenue and then turning right on Mount Olivet towards the Circle 7 prior to dropping off the suspects in the shooting. The government also introduced footage from a rotating camera on Montello Avenue that was directed at the Northeast Market parking lot. It showed the suspects walking and then starting to run towards the Circle 7. Footage from Northeast Market and Circle 7 captured different angles of the shooting. Footage from Kovak's Liquor showed the same gold car turning around in the Kovak's parking lot, then waiting. The two men ran to the car and jumped in, and the car sped down Mount Olivet Road toward the E Street/Rosedale neighborhood.

Law enforcement officers linked the shooting to a longtime feud between a group from the Trinidad neighborhood and a group from the E Street/Rosedale neighborhood. The decedent, Briscoe, and his companions were associated with the Trinidad neighborhood, and the appellant is associated with the E Street/Rosedale neighborhood.

Detective James Wilson, who was investigating the case, asked Metropolitan Police Department (MPD) Officers Jeffrey Scharf and Andre Sturgis to watch the surveillance footage. Both officers had patrolled the E Street/Rosedale area for over five years.

Detective Wilson showed Officer Scharf the video of the shooters running behind Briscoe and his friends. Officer Scharf quickly identified one of the men as Dwayne Hilton. He later testified that he recognized the appellant from his dreadlocks, left-handedness, and unique gait.[1] Detective Wilson showed the same video to Officer Sturgis a couple of weeks later. Officer Sturgis testified that neither Officer Scharf nor Detective Wilson had told him that they believed one of

---

[1] At trial Officer Scharf described appellant's run as "bowlegged" with a "stiff upper body."

the shooters was appellant. Officer Sturgis recognized appellant because of the way he ran.

Princeton Thorne, one of the victims, also identified appellant as one of the shooters. A prosecutor and Detective Gus Giannakoulias met with Thorne prior to his grand jury testimony. Upon seeing the name of the case on his subpoena, Thorne was adamant that appellant, whom he had known since elementary school, was not one of the shooters. After viewing the video footage, however, Thorne began "bawling" and stated, "I can't believe that that's Dwayne Hilton. I can't believe he shot [me]." Thorne recognized appellant's unique run, left handedness, and long dreadlocks.

Officer Sturgis, Officer Scharf, and Princeton Thorne testified about these identifications at trial. The prosecution also relied on video footage of the getaway car picking the shooters up at Kovak's Liquor to connect appellant to the shooting. Analysis of the footage and other investigation led the police to conclude that the car that picked up the fleeing gunmen was a 2001 gold Mitsubishi Galant owned by Jesmenia Cooper Queen. Ms. Queen's son, Ezra Queen, is one of appellant's

closest friends, and he often drove his mother's car. At the time of the shooting, appellant Hilton lived at Ms. Queen's house.

The government also presented three post-shooting phone calls from Ezra Queen, who was detained at the Prince George's County Correctional Facility for a matter unrelated to this case. On the second call, Ms. Queen told Ezra the police had visited her and wanted to know how often he used her car and if he was involved in a shooting; the police had a photo of the car. Immediately after speaking to his mother, Ezra called appellant to tell him about his conversation with his mother and that the police had a photo of her car leaving the scene. Appellant asked Ezra if the police "say the tags match" those on his mother's car.

## II. Issues Related to Trial

### A. Evidence Identifying Appellant

### 1. No impermissible suggestivity

Appellant argues that the trial court should not have admitted the testimony identifying him in the surveillance video because the identification procedures used by the police were "highly suggestive" and the results were unreliable.

"Because they determine the issue of admissibility, suggestivity and reliability are mixed questions of law and fact." *Walker v. United States*, 201 A.3d 586, 596 (D.C. 2019). "'We review mixed questions of law and fact under our usual deferential standard of review for factual findings . . . and [apply] *de novo* review to the ultimate legal conclusions based on those facts.'" *Caison v. Project Support Servs. Inc.*, 99 A.3d 243, 248 (D.C. 2014) (quoting *Hickey v. Bomers*, 28 A.3d 1119, 1123 (D.C. 2011)).

To suppress an out-of-court identification on due process grounds, a defendant must prove that the procedure was "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Long v. United States*, 156 A.3d 698, 707 (D.C. 2017) (quoting *Neil v. Biggers*, 409 U.S. 188, 197 (1972) (internal quotations omitted)). Even if the procedure is found to be impermissibly suggestive, the government can defeat the motion to suppress by showing the identification was reliable nonetheless. *Kaliku v. United States*, 994 A.2d 765, 782 (D.C. 2010). "'[I]f the identification procedures are not unduly suggestive, the details of those procedures are admissible and no reliability finding is necessary.'" *United States v. Brown*, 700 A.2d 760, 762 (D.C. 1997) (quoting *Greenwood v. United States*, 659 A.2d 825, 828 (D.C. 1995)).

The trial court found that none of the identification procedures were suggestive. It reasoned that Officer Scharf and Officer Sturgis did not know what the tape was about before they watched it, and neither officer knew for whom he was looking.[2] The only thing Detective Wilson told the officers prior to showing them the video was that he needed their assistance identifying individuals in surveillance footage. Detective Wilson did not know appellant Hilton, nor had he ever heard of him prior to Officer Scharf's identification. The trial court credited Officer Scharf's testimony that the question Officer Branson posed to him before he saw the video (inquiring if any of "Gucci's"[3] friends had dreadlocks) did not influence his identification of appellant.

When Princeton Thorne was not cooperative at trial, the prosecutor introduced Thorne's grand jury testimony identifying appellant. The trial court found that when Thorne came "to the homicide branch," he was adamant that appellant was not responsible for the shooting. When shown the enhanced version of the video, Thorne started bawling, and said the perpetrator was Dwayne Hilton, he was sure.

---

[2] Detective Wilson showed the video to the two officers separately, on days about two weeks apart.

[3] "Gucci" is the nickname of Robert Williams, an E Street/Rosedale associate.

The trial court did not clearly err in determining the facts, and it properly applied the law in concluding that the identification procedures were not suggestive. The officers viewed the surveillance video separately, and the trial court credited that they were not aware of for whom or for what they were looking. Detective Wilson "never knew or heard of Mr. Hilton, so he could not have made any suggestions about who [Officer Scharf] was to . . . look for on that video." Before viewing the footage, Princeton Thorne was convinced that appellant was not involved in the shooting.[4]

Although the trial court found no suggestivity in the identification procedures, it did address the reliability prong, stating that "the reliability is overwhelming." The court found that each of the identifying witnesses had known the appellant for over five years and interacted with him frequently. The record shows that the trial court properly denied appellant's motion to suppress this evidence.

---

[4] Homicide Watch put the original footage of the shooting on YouTube, and Princeton Thorne watched it. Thorne did not recognize the perpetrators when he saw the YouTube video. Thorne stated that the footage he viewed at the AUSA's office before his grand jury testimony was clear compared to the YouTube video; the YouTube video was blurry and he could not see the suspects' faces. The trial court found that there was no suggestivity from Thorne's viewing of the YouTube video because "the only comment out of him was that it was not clear."

## 2. Lay opinion testimony

Appellant also argues that the identifications should have been excluded because they failed to satisfy the *Sanders* test for admitting lay opinion testimony. Lay opinion testimony regarding the identity of a person shown in a surveillance videotape or photograph is admissible if the testimony is (1) "rationally based on the perception of a witness who is familiar with the defendant's appearance and has had substantial contact with the defendant" and (2) "helpful to the factfinder in determination of a fact in issue." *Sanders v. United States*, 809 A.2d 584, 596 (D.C. 2002). The admission of such testimony identifying a person in a video or photo is reviewed for abuse of discretion. *Young v. United States*, 111 A.3d 13, 15 (D.C. 2015).

The trial court found that the testimony fulfilled the *Sanders* requirements for admissibility because the images on the surveillance footage were not clear enough for the jury to make an identification by comparing the video image to a photograph of Hilton which had been admitted. Since the officers and Thorne had known the appellant for years prior to their identifications, they were "more likely to accurately identify the defendant than would be the jury."

Testimony at the suppression hearing and at trial established that both officers were very familiar with Hilton. They had known appellant for seven or eight years before making their identifications. Both had watched appellant play basketball and football throughout their time patrolling the neighborhood. Officer Scharf testified at trial that he used to talk to appellant daily and had recent contact with him before the shooting. Princeton Thorne had known appellant for more than ten years when he made the identification. He had known appellant since elementary school, and they attended high school together.

In *Sanders*, the court held that the familiarity of a witness with the defendant was important, and helpful to the jury, because "the videotape [] was 'not all that clear.'" 809 A.2d at 596. The testimony was particularly helpful in this case because the officers and Thorne did not identify appellant based simply on his facial characteristics but rather on his dreadlocks, his left-handedness, and, especially, the way he ran. For instance, Officer Scharf said "[h]e has a bit of a distinct walk and jog. Muscular upper body, stiff, walk like a pigeon-toed run. So I immediately pointed out that it was him." He also testified that he has never seen anyone run like the appellant does. Officer Sturgis described the appellant's run as "very unique" and "different."

In *Young*, this court held that a lay witness's identification of a defendant based on his "'stance, the gait, and the jacket looking familiar' was helpful to the jury, who would have an inferior ability to recognize Mr. Young based on these attributes."  111 A.3d at 16; *see also Sanders*, 809 A.2d at 594 (identification based in part on defendant's "sway").  Similarly, the officers and Thorne were in a better position to identify appellant from his run than the jurors because they have known appellant for many years and watched him play sports and run.   The jurors did not have this foundation for recognizing appellant in the video.

## B.  Evidence of Motive

Prior to trial, the government sought permission to introduce evidence of animosity between the Trinidad and E Street/Rosedale neighborhoods to provide background and motive for the shooting.   It also asked to present evidence supporting the inference that Briscoe and his companions were shot in revenge for the murder of Robert Mallory, who had been associated with E Street/Rosedale. Mallory was killed in 2008, almost four years before Briscoe and his companions were shot, but the sentencing of John Youngbey, who pled guilty to Mallory's murder, took place just sixteen days before the shooting at the Circle 7.   The

government argued that "the wounds have been opened anew." Youngbey was associated with Trinidad.

The prosecution sought to prove that Mallory and appellant Hilton were close friends, and to argue that Hilton shot at Briscoe and his companions in retaliation for Mallory's death. After extensive discussion, the court concluded that the government's evidence of motive was "probative and relevant." Further discussion clarified that the government would mostly be presenting evidence of "state of mind" — "[i]t's not going to be acts of violence" and the government would not use the word "gang."

Appellant argues that this was evidence of "other crimes" which should have been excluded because "evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew v. United States*, 331 F.2d 85, 89 (D.C. Cir. 1964) (emphasis added). But "[e]vidence of other crimes is admissible when relevant" to prove, among other things, motive and intent. *Id*. at 90. And "*Drew* does not apply . . . to evidence of uncharged criminal conduct 'where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the

evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context.'" *Brown v. United States*, 934 A.2d 930, 940 (D.C. 2007) (quoting *(William) Johnson v. United States*, 683 A.2d 1087, 1098 (D.C. 1996) (en banc)).

The murder of Mallory certainly was a crime, but reference to his death was not inadmissible "other crimes" evidence. The government was not suggesting that Hilton killed his friend Mallory or was involved in any prior crimes, so evidence of Mallory's death was not being used to show that Hilton was a violent person with a disposition to commit murder. Instead, evidence of Mallory's death was admissible to suggest appellant's motive and intent and to place this crime in an understandable context.

Appellant argues that, even if it was relevant, the evidence of neighborhood affiliation and Mallory's murder was unfairly prejudicial. "The 'trial judge has the discretion to exclude [such] evidence [of gang retaliation] if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Campos-Alvarez v. United States*, 16 A.3d 954, 960 (D.C. 2011) (quoting *Plummer v. United States*, 813 A.2d 182, 189 (D.C. 2002)). "There is, however, no special admissibility rule

for gang-related evidence: it is subject to the same balancing test as other evidence." *Id.* This court has held that when reference to a gang "suppl[ies] a motive . . . for an otherwise unexplained [shooting]," it is relevant. *Lazo v. United States*, 930 A.2d 183, 185 (D.C. 2007); *accord*, *Campos-Alvarez*, 16 A.3d at 960-61.

Importantly, the evidence of Mallory's death and the animosity between the neighborhoods was "introduced in minimally inflammatory fashion." *Lazo*, 930 A.2d at 186. Basic information about Mallory's murder was presented through a stipulation of the parties which was read to the jury. It gave the date, time, and location of Mallory's shooting and stated that John Rufus Youngbey had pleaded guilty to the offense. The parties also stipulated that Youngbey was sentenced on November 10, 2011.[5]

This case is distinguishable from the portions of *Bryant v. United States*, 148 A.3d 689 (D.C. 2016), on which appellant relies. In *Bryant*, the government introduced evidence of an ongoing feud that resulted in multiple murders. *Id.* at 698-99. This court ruled that evidence of gang affiliation and the feud itself was

---

[5] Part of the government's evidence of "the beef" included testimony about "tagging" or spray-painting areas of the neighborhood with derogatory language about the rival group. Other evidence included testimony about a sports rivalry between the two groups.

admissible to provide context and to show the defendants' motive for participating in the crime on trial. However, evidence of two specific murders in which one of the defendants and a cooperating witness were involved was inadmissible (but harmless) other crimes evidence. The evidence was not necessary to establish the "gang-related motive for the shoot-out" because it was cumulative of other testimony describing the feud. *Id.* at 699. Moreover, one murder was irrelevant to show the defendants' motive, and the other murder had occurred four years before the crime at issue. *Id.* In this case, by contrast, there was no such prejudice. Appellant Hilton was not involved in Mallory's murder. The government even introduced the arrest warrant and supporting affidavit showing that Youngbey committed that offense.

Evidence of Mallory's death was relevant to establish appellant's motive and to put the crime into context as being a part of the animosity between the E Street/Rosedale and Trinidad groups. Although reference to the feud which led to Mallory's death had the potential to cause prejudice because of the implication that appellant was part of a gang, the trial court took care to ensure that the E Street/Rosedale and Trinidad groups were not referred to as gangs, and that the affiliates were not referred to as gang members. The probative value of Mallory's

death was not substantially outweighed by the danger of unfair prejudice, and the trial court did not abuse its discretion.

## C. Pre-trial Proffer of *Winfield* Evidence

Before appellant's trial, the government disclosed that on March 31, 2012, one of the guns used in the Briscoe shooting had been fired during a botched robbery five miles away from the Circle 7. A crime scene technician collected shell casings at the scene of the Briscoe murder but no guns were found. The police found two shell casings at the scene of the attempted robbery and determined that they had been fired from one of the guns used in the murder of Briscoe. Appellant argues that the trial court committed reversible error when it denied him the right to present evidence related to this attempted robbery.

Defense counsel asserted there were additional similarities to the Briscoe shooting: there were two or three men wearing masks;[6] those men approached a group of four men by slowly running toward them; the men began shooting with

---

[6] In his pretrial motion, Hilton's trial counsel mentioned that the Northeast Market video shows the first of the two perpetrators pulling a mask over his face, and that a mask was recovered near the scene. The second perpetrator, who was identified as appellant, is not seen with a mask.

little to no warning; and one of the shooters had dreadlocks. What actually happened in the botched robbery is far from clear, however. One version is that Wesley Hilliard, Osetia Emegbusim, and an unidentified man approached four men who were standing near a Range Rover and announced a robbery. The intended victims fled, witnesses heard shots, and Hilliard, one of the would-be robbers, soon appeared at a nearby recreation center with a bullet wound in his shoulder. Appellant's proffer focused on Hilliard as a potential third-party perpetrator of the Briscoe shooting. After briefing and considerable discussion, the trial court ruled that there was not a sufficient link or nexus between the two crimes. *See Winfield v. United States*, 676 A.2d 1, 4 (D.C. 1996) (en banc) (requiring a "link, connection or nexus between the proffered evidence and the crime at issue"). "While the *Winfield* standard may be considered a relatively low standard," the court observed, "it just has not been met in this [instance.]"

"A third-party perpetrator defense requires 'proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense.'" *McCraney v. United States*, 983 A.2d 1041, 1050 (D.C. 2009) (quoting *Winfield*, 676 A.2d at 4). "Without such a foundation in the evidence, the defense is unduly speculative and likely only to distract and mislead the jury." *Id.* at 1050. "[W]e must look at the totality of the

circumstances to determine whether there was sufficient evidence to satisfy the *Winfield* relevancy standard." *Bruce v. United States*, 820 A.2d 540, 545 (D.C. 2003). In other words, "our inquiry is strongly rooted in the facts of each individual case[.]" *Id*. at 544.

"The 'focus' of the standard is not on the third party's guilt or innocence, but on 'the effect the evidence has upon the defendant's culpability,' and in this regard it 'need only *tend* to create a reasonable doubt that the defendant committed the offense.'" *Winfield*, 676 A.2d at 4 (quoting *(Woredell) Johnson v. United States*, 552 A.2d 513, 517 (D.C. 1989)). "However, the trial court should exclude *Winfield* evidence if it is 'too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.'" *Thomas v. United States*, 59 A.3d 1252, 1264 (D.C. 2013) (quoting *Resper v. United States*, 793 A.2d 450, 460 (D.C. 2002)). "'We review a trial court's determination on the admissibility of a third-party perpetrator defense for abuse of discretion, and that determination will be upset on appeal only upon a showing of grave abuse.'" *Id.* at 1263 (quoting *Melendez v. United States*, 26 A.3d 234, 241 (D.C. 2011)).

The trial court did not abuse its discretion by determining that this evidence was too "generic" or speculative to be admissible under *Winfield*. While evidence that the same gun was used in both crimes is noteworthy, of course, it does nothing to suggest that appellant Hilton was not involved in the shooting of Briscoe. Two men were involved in the shooting of Briscoe and his companions, and nothing tied this particular handgun to Hilton instead of his accomplice (who was not apprehended). Furthermore, the handgun could easily have been passed around in the months following the murder of Briscoe. In addition, only speculation ties the gun to Hilliard, who appellant hypothesizes might have been one of the shooters at the Circle 7. The two shell casings at the scene of the robbery were found in and near the Range Rover, seeming to indicate that they had been fired by one of the intended victims of the robbery, not by Hilliard.

This court considered a similar question in *Andrews v. United States*, 179 A.3d 279 (D.C. 2018), where the crux of the appellant's proffer was that a potential third-party perpetrator was linked to a murder weapon six weeks before the murder occurred. This court ruled that because there was no evidence placing him "in the neighborhood near the time of the shooting" and no evidence that he

had a motive to kill the victim, the previous link to the murder weapon was insufficient to permit a third-party perpetrator defense. *Id*. at 295-96.[7]

In this case, the shell casings found at the scene of both crimes do not create a nexus sufficient to satisfy the *Winfield* standard. Seeking to add more, appellant asserts that Hilliard had a practical opportunity to commit the Briscoe shooting because both of the District of Columbia addresses the government provided for Hilliard "would have placed him within the District and a short driving distance away from the Briscoe shootings." In making this claim, appellant misplaces his reliance upon our decision in *(Terry) Johnson*.

In *(Terry) Johnson* the government relied upon evidence of a pre-existing feud between appellant and the decedent, and incriminating admissions allegedly made by the appellant, to obtain a conviction. *(Terry) Johnson v. United States*,

---

[7] This case is not like *Battle*, where this court held that the trial court erred in failing to admit evidence that the gun used in the homicide of which Battle was convicted had been used by a different man in a different shooting in the same neighborhood two weeks earlier. *Battle v. United States*, 754 A.2d 312, 314 (D.C. 2000). Importantly, the proffer also included evidence that Battle had been misidentified as the perpetrator of the first shooting because they were so close in appearance; those charges were dropped because Battle was incarcerated at the time of the first shooting. *Id.* at 315.

136 A.3d 74, 78 (D.C. 2016). But two other men had strong motives to kill the decedent. *Id.* at 81-82. Both men had been robbed and assaulted by the decedent in the weeks prior to his murder. *Id.* Further, both men were familiar with the neighborhood and were not incarcerated at the time of the decedent's murder. *Id.* This court held the trial court erred in rejecting appellant's proffered evidence as insufficient because the probative value of motive in establishing the perpetrator's identity is diminished if it is not unique to the defendant but shared by others. *Id.* at 83.

It was in this context that this court said that "'[p]ractical opportunity' means that the third party had 'at least inferential knowledge of the victim's whereabouts' and was not incarcerated or otherwise physically unable to commit the crime; proof actually placing the third party at or near the crime scene is not required." *Id.* at 80 (quoting *Winfield*, 676 A.2d at 5-6). *Johnson* does not purport to overrule *Resper*,[8] and nothing in *(Terry) Johnson* suggests that in every case a defendant will satisfy *Winfield* merely by pointing to a suspect who was not incarcerated at the time. *Id.* The holding in *(Terry) Johnson* was based on the

---

[8] *Resper*, 793 A.2d at 460 ("[t]he fact that others with reason to seek revenge may have been present in a neighboring state, in the District, or perhaps, even in a nearby neighborhood, does not, without more, satisfy the requirements of a 'practical opportunity.'")

totality of the circumstances presented there, including the nature of the government's evidence against Johnson, the proof that two men other than the defendant had strong motives to harm the victim, *and* that they had the practical opportunity to do so. *Id.*

In this case appellant's proffer did not even meet *(Terry) Johnson*'s definition of "practical opportunity" because it did not show that Hilliard had "at least inferential knowledge of [Briscoe's] whereabouts." 136 A.3d at 80. So far as the proffer discloses, they were complete strangers. The most glaring defect is the lack of any motive for Hilliard to shoot at Briscoe and his companions. There was no proffer of animosity between them, and the robbery occurred in a completely different part of town, with no apparent connection to either the E Street/Rosedale or Trinidad neighborhoods.

Nothing else makes up for these defects in appellant's proffer. Although both appellant and Hilliard had dreadlocks, Hilliard's were noticeably shorter than appellant's. Also, Hilliard was a suspect in an attempted robbery, and there is no evidence that Briscoe was shot during a robbery or attempted robbery. Thus, there is no distinctive *modus operandi* suggesting the same person committed both

crimes. Perhaps most importantly, there was no proffer that one or more potential witnesses had watched the surveillance footage from outside the Circle 7 and said that the second gunman was Hilliard instead of appellant Hilton. The trial court did not abuse its discretion in declining to admit this evidence because it was too speculative, and "likely only to distract and mislead the jury." *McCraney*, 983 A.2d at 1050.

### III. Post-Conviction Motion

About a month after appellant's trial was completed, the government began making a series of disclosures regarding the murder of Kevin Johnson. Johnson, who was wounded in this case (on November 26, 2011), was shot and killed on June 26, 2015. Appellant Hilton was incarcerated at that time. At the time of trial, the defense was aware that Kevin Johnson had been murdered. The government's post-trial disclosures included a video of two men running down an alley and shooting at Johnson (and perhaps others).

In May of 2017, the defense filed a motion to vacate appellant's convictions and order a new trial, asserting that the government had violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and, alternatively, that appellant

was entitled to a new trial based on newly discovered evidence. The defense argued that the post-trial disclosures showed: (1) the shooting of Johnson occurred two blocks from the Briscoe shooting; (2) both of the men shown shooting at Johnson were left-handed, a trait the government had emphasized was sufficiently rare that it helped identify appellant Hilton as one of the men who killed Briscoe; (3) one of the men shooting at Johnson had dreadlocks; (4) officers believed the murder was part of the same feud between the Trinidad and E Street/Rosedale groups; (5) Suspect 1 (S-1) in the murder of Johnson was an African-American male with dreadlocks; and (6) Detective Wilson, who investigated Briscoe's murder, was also investigating Johnson's murder.

The trial court denied appellant's motion to vacate his convictions, concluding that "[e]ven if the evidence at issue had been disclosed prior to and admitted at trial, there is no reasonable probability of a different result." "There is no factual link between the two murders, other than the fact that Johnson was present at the location of both crimes. While the two individuals that killed Johnson used their left hands to shoot, there is no evidence that one of these individuals is the same person seen carrying a firearm in his left hand in the Northeast Market video."

## A. *Winfield* Evidence

We understand appellant's primary claim to be that the government violated its obligations under *Brady* because, had the defense known of this information prior to trial, he could have presented a compelling *Winfield* defense. According to appellant, he could have argued that the evidence (that one of the shooters in the newly discovered video had dreadlocks, was left-handed, and shot at Johnson because of the same feud between the Trinidad and E Street/Rosedale groups, and did so two blocks from where Johnson had been shot before) "tended to create a reasonable doubt" that Hilton had shot Briscoe and his companions. Appellant asserts that this proffer of evidence undermined the government's argument that several core elements of its circumstantial case contributed to identifying him as the shooter of Briscoe in 2011, namely his left-handedness, his hairstyle, and his motive.

To establish a *Brady* violation, "an appellant must show that the evidence in question (1) 'is favorable to the accused' (2) 'was possessed and suppressed by the government, either willfully or inadvertently;' and (3) is material to guilt or punishment." *Andrews*, 179 A.3d at 286-87 (quoting *Vaughn v. United States*, 93

A.3d 1237, 1254 (D.C. 2014)). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Miller v. United States*, 14 A.3d 1094, 1115 (D.C. 2011) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Mackabee v. United States*, 29 A.3d 952, 959 (1985) (quoting *Bagley*, 473 U.S. at 682) (internal quotation marks omitted). "'[W]e evaluate the tendency and force of the undisclosed evidence item by item; . . . . We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion[.]'" *Turner v. United States*, 116 A.3d 894, 914 (D.C. 2015) (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 n.10 (1995)).

When examined closely, appellant's argument that one of the men who shot Johnson in 2015 might have murdered Briscoe in 2011 is "too speculative" to satisfy the requirements of *Winfield*. First, it is not clear that the perpetrators portrayed on the black and white video were targeting Johnson. Second, the video is not clear enough to discern any identifying features of the perpetrators. Next, evidence linking S-1, the only suspect in the 2015 crime, to Briscoe's shooting does not pass muster under *Winfield*. Lastly, the shootings of Briscoe and Johnson were remote in time and the motive provided by the feud between the E

Street/Rosedale and Trinidad groups was not unique to the two men who shot Briscoe.[9]

It is not certain who the men shown in the 2015 video were targeting at the time Johnson was shot. The trees, bushes, and cars obscure where Johnson was standing at the time. As a result, it is not clear whether Johnson was standing alone or with other people.

Next, the 2015 footage is not of good enough quality and the shooters are too far away to spot any distinguishing features. Appellant maintains that, at the time of Johnson's murder, a witness saw two men shooting, and one of the men had long dreadlocks. The witness looked out the window and saw a man shooting

---

[9] Appellant suggests that Johnson's killing was one of a series of "retaliatory shootings" between the E Street/Rosedale and Trinidad groups. Three days prior to Johnson's shooting, Heineken McNeil, a member of the E Street/Rosedale group, was killed, and "[i]t was highly suspected that Heineken was killed by members of the Trinidad crew." Appellant asserts that Johnson was murdered in retaliation for the killing of Heineken McNeil. Four days after Johnson was shot, E Street/Rosedale member Darrell Grays was killed. The man arrested for killing Grays suggested to authorities that the murders of Heineken McNeil, Kevin Johnson, and Darrell Grays were all related. However, Cathy Lanier, then the MPD Chief of Police, held a press conference stating that, after investigating McNeil's murder, MPD confirmed that his death was not a result of the Trinidad and E Street/Rosedale feud. Chief Lanier emphasized that she wanted to get this message out to the community in order to stop further violence.

towards Raum Street. Appellant alleges that the fact that one of the perpetrators was wearing dreadlocks establishes a similarity between Johnson's shooting and Briscoe's shooting, but at least two groups were shooting at the time Johnson was killed. When the shooters shown on the video ran through the alley toward Raum Street and fired at Johnson, a group hanging out down the block fired back. The government emphasizes that the witness saw a man with dreadlocks shooting next to 1260 Raum Street, and therefore was not referring to one of the two shooters from the 1269 alley. It thus is not clear if the witness who saw two men shooting saw the shooters portrayed on the video or the response from the group down the block. Although the video is not clear, from what is visible, neither suspect appears to have dreadlocks. Further, no other distinguishing features can be determined from the video.

Although the government has not arrested anyone for Kevin Johnson's murder, it has identified S-1 as a suspect. S-1 is associated with the E Street/Rosedale neighborhood and became a suspect because the girlfriend of his friend Darrell Grays told police that Grays had loaned his 9mm firearm to S-1. Grays' girlfriend relayed this information to police after Darrell Grays was killed four days after Johnson's death.

Grays' girlfriend said Grays lent S-1 his firearm prior to Johnson's death. The day after Johnson's death he received a text message from S-1 that stated "I need to feed the baby today," which apparently was a request for more ammunition. Grays lent the ammunition to S-1. Some of the ammunition that police recovered from the alley that Johnson's shooters ran down had the same RP (Remington Peters brand) head stamp as Grays' leftover 9mm ammunition. Police executed a search warrant at S-1's apartment and recovered two firearms, but determined they were not used in Johnson's murder.

S-1 does not have any apparent connection to Briscoe's shooting. S-1 is 5'7" tall and weighed around 220 pounds at the time of Briscoe's shooting; Hilton is 6'1" tall and weighed 180 pounds at the time of Briscoe's shooting. S-1 is considerably older than Hilton; he was born in 1976 and Hilton was born in 1991. Further, Officer Sturgis and Officer Scharf knew S-1 and did not identify him as a perpetrator shown in the Northeast Market video. Appellant has not proffered that anyone has ever identified S-1 as one of the individuals shooting at Briscoe and his companions. Also, S-1's criminal records suggest he is right-handed, as opposed to the perpetrators in both the shooting of Briscoe and the later shooting of Johnson, who are shown on video to be left-handed. Without more, S-1's E

Street/Rosedale connection and dreadlocks are not enough to satisfy the requirements of *Winfield*.

Appellant's proffer is also too speculative because Johnson's murder occurred four years after Briscoe's murder, reducing the likelihood that the same person committed both crimes. Further, appellant's reliance on the E Street/Rosedale and Trinidad feud to connect the two murders is not enough to identify the men who murdered Johnson. The beef was widespread throughout the community, and the animosity was not limited to a small group of potential perpetrators. Although the murders occurred only blocks away from each other, in an area frequented by the Trinidad group, the fact that both murders occurred on Trinidad turf does not connect the perpetrators of the two crimes.

We recognize that, if a defendant proffers that a third-party committed another crime similar to the one before the court, the evidence "need not be identical" to be admissible if "the totality of the circumstances demonstrates a reasonable probability that the same [person committed both offenses]." *Bruce*, 820 A.2d at 544 (quoting *Newman v. United States*, 705 A.2d 246, 257 (D.C. 1997)). Appellant's proffer does not satisfy this requirement. Because Johnson's

shooter has not been identified, his motive is a matter of speculation. But even assuming that the murder of Johnson was motivated by the neighborhood feud, a "trial judge ordinarily may exclude evidence of third-party motivation unattended by proof that the party had the practical opportunity to commit the crime, including at least inferential knowledge of the victim's whereabouts." *Winfield*, 676 A.2d at 5. Most importantly, even if the Trinidad and E Street/Rosedale feud was a motivating factor for Johnson's shooters, there is no indication that the shooters (whoever they were) had a practical opportunity to shoot Johnson and Briscoe in 2011.

In sum, appellant did not proffer any evidence that connected either S-1 or the men shown shooting at Johnson to Briscoe's murder.[10] It is too speculative to say that because Johnson was shot on both occasions; the Johnson shooter was left-handed and possibly wore dreadlocks; and the shooting in 2015 was thought to relate to the same neighborhood feud as the shooting of Briscoe, there is a reasonable probability that at least one of the men seen shooting at Johnson murdered Briscoe more than three years earlier.

---

[10] At no point in his briefs does appellant argue that S-1 is one of the men shown in the video of Johnson's shooters. Appellant makes two seemingly inconsistent arguments: that S-1 is responsible for the murders of both Briscoe and Johnson, and that the perpetrators caught on video shooting at Johnson were also responsible for Briscoe's murder.

## B.  *Brady* Evidence Nonetheless?

For reasons we have just explained, the evidence related to Johnson's murder that was disclosed after this trial ended could not properly be used under *Winfield*.  Appellant asserts in the alternative that, even if that were true, trial counsel could have used the evidence to cross-examine the officers involved in the case, question the adequacy of the police investigation, and put the case in such a different light as to undermine confidence in the verdict.  Had the defense known about the left-handedness and dreadlocks of the Johnson shooter, appellant asserts, his trial counsel could have challenged the supposed uniqueness of appellant's dreadlocks and left-handedness, and questioned whether the police considered any other persons who were "E Street enforcers," such as S-1, to be suspects in the Briscoe shooting.  This assertion is essentially a reiteration of appellant's *Winfield* argument, which we have rejected.

To be sure, in *Kyles v. Whitley*, the Supreme Court did hold that the *Brady* doctrine extended to *some* evidence that could be used to attack the adequacy of a police investigation.  *Kyles*, 514 U.S. at 445.  But to establish a *Brady* violation, a defendant must show materiality — "that the favorable evidence could reasonably

be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435.

This case is easily distinguished from *Kyles*, where the prosecution had not disclosed a variety of information, including a key informant's prior police interviews, which were replete with inconsistent statements. *Id*. at 428-29. That informant, referred to as "Beanie," also had made statements that tended to incriminate himself, and he had had opportunities to "plant" physical evidence which was used to convict Kyles. *Id*. at 424-26. Yet, cross-examination could have revealed that the police had failed to direct any investigation against Beanie. *Id*. at 442 n.13. The Court held that the cumulative effect of this (and other)[11] information was material because, had it been brought out on cross-examination of the police, it would have allowed the jury to see that Beanie was "anxious" for Kyles to be arrested for murder and that the police had a "remarkably uncritical attitude" toward Beanie. *Id.* at 445.

---

[11] The government had also failed to disclose information that could have been used to impeach eyewitnesses. *Kyles*, 514 U.S. at 450. As the Supreme Court summarized, "suppressed evidence would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid." *Id.* at 454.

"Materiality requires that a trial judge examine the withheld evidence 'in the context of the entire record, and determine in light of the examination,' whether the withheld evidence puts the trial in a different light so as to undermine confidence in the verdict." *Andrews*, 179 A.3d at 289 (quoting *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017)). In light of the government's evidence against appellant Hilton, even if the defense could have used the Johnson evidence to question the persuasive force of appellant's left-handedness and dreadlocks, and the police investigative procedures, the evidence would not have undermined confidence in the verdict.

Three people who were well-acquainted with appellant identified him in the Northeast Market video: Officer Scharf, Officer Sturgis, and Princeton Thorne. They identified him based not only on his left-handedness and dreadlocks but also on his gait. Further, they were very confident in their identifications. Next, a gold Mitsubishi was seen in video footage picking up the Briscoe shooters as they fled the scene of the crime. Police investigation identified this car as belonging to Ms. Queen. Appellant was a close friend of Ms. Queen's son and was living with her at the time. The government also introduced incriminating jail calls from Ezra Queen to appellant. Thus, the police relied on much more than the perpetrator's

left-handedness and dreadlocks to identify and convict appellant Hilton.[12]  Because

the evidence related to the murder of Johnson was not material, the government did

not violate its *Brady* obligations.

## IV.  Merger

Appellant was convicted of four counts of PFCV: one predicated on the

first-degree murder of Mico Briscoe and three predicated on the armed assaults of

Kevin Johnson, Princeton Thorne, and Tevon Brent with intent to kill them.

Although neither party raised the issue of merger, we do so now.

Generally, "where . . . predicate armed offenses do not merge, a defendant

may be convicted of separate counts of PFCV relating to each offense."  *Terry v.*

---

[12] Appellant also argues that the trial court abused its discretion by never addressing or considering any of the factors required for granting a new trial, as he also moved for a new trial based on newly discovered evidence.  In order to obtain a new trial, appellant must show "'(1) the evidence is newly discovered; (2) the moving party was diligent in seeking to obtain the evidence; (3) the evidence is material to the issues involved and not merely cumulative or impeaching; and (4) it is of a nature that it would probably produce an acquittal.'"  *Barber v. United States*, 179 A.3d 883, 893 (D.C. 2018) (quoting *Porter v. United States*, 826 A.2d 398, 414 (D.C. 2003)).  For the reasons articulated above in this court's *Brady* analysis, the new evidence is not material, and would not have "probably produce[d] an acquittal."

*United States,* 114 A.3d 608, 629 (D.C. 2015) (quoting *Hampleton v. United States*, 10 A.3d 137, 146 (D.C. 2010)). However, "multiple PFCV convictions will merge 'if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence.'" *Hagood v. United States,* 93 A.3d 210, 226 (D.C. 2014) (quoting *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006)). Appellant and his accomplice are shown on surveillance footage firing a volley of shots in a single act of violence. They did not pause to aim at each victim separately, so appellant's four PFCV counts should merge into one.[13]

## V. Conclusion

Consistent with the foregoing opinion, we remand to the trial court to vacate three of appellant's convictions for PFCV. In all other respects, we affirm.

*So ordered.*

---

[13] It is not necessary for the trial court to resentence appellant. Although the four PFCV sentences are running consecutively to each other, they are running concurrently with the sentences for the predicate felonies. Each PFCV sentence runs for seventy-two months, amounting to a total of 288 months for all four counts. Appellant's first-degree murder sentence runs for thirty years or 360 months. Therefore, vacating three of appellant's PFCV convictions would not affect his overall sentence.